Good morning, everyone. We have four cases to be argued on the calendar today. So I'm going to dispense with reading the calendar this morning. We're ready to begin with the first Good morning, Your Honor. Good morning. May it please the Court, I'm Robert Clarida of Raitler, Kalis & Rosenblatt for the appellants, Valerie M. Peretti-Acuti and Paul J. Reitenauer III. I've And with the Court's permission, I'd like to get right to the statutory argument, unless the Court has questions about the facts. The statute at issue here is 17 U.S.C. Section 203A1, part of the Copyright Act, which is about terminating certain grants. And the full text of the first sentence of 203A1 reads, In the case of a grant executed by one author, termination of the grant may be affected by that author or if the author is dead, by the person or persons who, under Clause 2 of this subsection, own and are entitled to exercise a total of more than one-half of that author's termination interest. The statutory language is clear. It means what it says, and it says what it means. And the necessary result is equally clear. The copyright assignment at issue here was properly terminated because it was executed by the author. It was after January 1, 1978, and the proper statutory heirs served the notice. For those reasons, the motion to dismiss should have been denied in all respects, and the declaratory judgment should have been granted in the appellant's favor. The District Court's fundamental error was to misread the statute and not give it its plain meaning. And the result was just a novel... It's not really plain. I mean, you're saying the plain meaning is that someone who doesn't have rights can execute a grant affecting a transfer of those rights? That's not how the statute reads, Your Honor. The statute says if there is a grant that is executed by the author, that grant is terminable. Here, the 1983 grant at issue was executed by the author and also by his statutory heirs. Well, when you say executed, however, that is not the same word as signed. Executed is actually defined in Section 204, that a transfer of copyright ownership is not valid unless the instrument of ownership is conveyed. That would seem to suggest that you can't, more or less as Judge Livingston suggested, you can't execute a transfer if you're not the person who owns what is being transferred. And here, as you just acknowledged, there are separate rights possessed by the author and by the various members of his family. And they each executed this document with respect, one might say, one might say, and I grant you there is some ambiguity here, that each executes the grant or transfer of his or her own rights. So why is that not a perfectly plausible reading of the statute? Putting aside whether it's the right one, in terms of plain meaning, isn't there at least a good possibility that that's the right way to read what Congress intended? Not if you consider what the word grant means in the statute, though. The grant in the statute is not a legal abstraction based on the fraction of rights that someone owns. A grant under the statute, under Section 203 specifically, is the document that is executed, and it can have more than one signatory. Why do you say a grant is the document rather than the substance of what the document intends to do? If, you know, going back to medieval times, if the king gives a land grant to someone, there's a document that effectuates that transfer, but you wouldn't, at least I wouldn't typically say that that document is the grant, or at least that's one way of using the word grant, but an equally plausible way of saying that what the king did was the grant, and this document is the execution of the grant. And if there were no language in the Copyright Act, to the contrary, that would be a plausible reading. But in the very next sentence of 203A1, it deals with a case of a grant executed by two or more joint authors. Yes, but that's a very different situation, because there there is one right that is jointly owned by two people, and the two people both need to sign it, right, in order to transfer it. But they don't all need to terminate it. That grant, that single grant, can be terminated not by all the joint authors, but by a majority of the authors who sign it. That's okay. The question, you're talking about what the meaning of the word grant is, and I'm suggesting that in this case, it takes the two people, because that's what conveys, it takes the two people to convey that interest, if they're joint authors. But in this case, in our case, we have people with separate rights, separate contingent rights, indeed, that are sort of mutually exclusive, in effect, right? The author's transfer is only going to be meaningful if he lives to a certain point where the right, by definition, he has no right at all to transfer when that time comes, while the other party is the successors in interest, only have rights if he doesn't live until the expiration. So it's quite different than the situation of two authors. But, Your Honor, this is engaging in the district court's, what the district court admitted was a counterfactual, assuming all these were on separate documents, and assuming they were all separate grants. I didn't say anything about separate documents. I'm talking about the document and what are the grants. And furthermore, it seems all the more peculiar, though, since you bring it up, to say, and I think you concede, that if they each entered, if there were four documents with each of the rights holders signing one, the answer would be clear, but if they put all of the transfers in the same document, then suddenly we have a different answer. Why would that, what would that mean? Because the other documents signed by these hypothetical other signatories wouldn't have the author's execution. The author has not executed a grant just from the wife. He did not execute a grant just from Luigi Creatore, who was one of his co-authors, who signed his own grant with his own What do you say, what does jointly and severally mean in this case? It would seem that they are several in that each of them has separate rights. So I'm not sure how, what would be the force? You know, joint and several comes from tort law. It's something that has to do with judgments and against whom a judgment can be executed. What could the meaning of joint and several be here? The meaning of joint and several here is that they were all acting together. Hugo's grant was not, I'm granting on behalf of Hugo and my family can do what they want to do. This was all one grant and the intent of the parties was it would all be taken as one grant. And the Algorabats... In terms of the commercial reality, I suppose it's only worth anything to the, it's worth a lot less to the more effective to accomplish the goals of the purchaser. But that, you know, again, all you need is to have a joint closing, really, right? You had all those four documents, everybody sat around the table and signed. That would be exactly as good for the purpose, separately, exactly as good for the purchaser as doing it this way. But that's not what happened in this case, Your Honor. If that had happened in this case, the result very well could have been different, as it did with Luigi Creatore. Why would Congress have intended such a result to distinguish between those two cases? Why would Congress have wanted such a result to distinguish between those two cases? Because Congress wanted the author to be able to protect his or her statutory heirs from the statute in a way that leaves the statutory heirs out in the cold. And that's not the way the statute was intended to be written. But I thought you were distinguishing between a case in which there's one document executed by every family member, we could call it the family grant, and a situation in which there's, there are four different documents separately executed. Right. And because the separate documents would not have been executed by the author, not jointly separately or any other way. They would just have the signature of the wife. I understand that, but I'm just asking why if, given the purpose that you're articulating for the statute, why would Congress have wanted to distinguish between those two cases, where there's one document and the family all executes the same document, and the family meeting where they just happen to execute separate documents, each transferring their own interest? Because Congress created the statute using the word executed. It didn't say grants made by the author or rights granted by the author. It said transfers executed by the author. But it also didn't say signed by the author. The Congress could have made it clearer in either direction. And they didn't make it clear in either direction. They used a word that could be interpreted both ways. But let me ask about the context. What do you do with Section 304C? Because there, you have Congress explicitly allowing transfers, allowing termination by the successors. Right? And it's a distinguishable situation in terms of the dates and so on from this one. Which says to me that Congress clearly knew how to explicitly grant termination rights to successors, as distinguished from this situation, where it seems to me that there's not that situation. So help me out with that. But Congress also explicitly made Section 304 dependent on the copyright date of each work. It's a work-by-work analysis. Section 203 was designed to get rid of that necessity for post-1978 grants, because that renewal structure was no longer applicable to the grants. Any grant after 35 years, whether it's original term or renewal term. Why isn't this a work-by-work analysis, depending on what is actually the subject of the grant? You could grant rights in one work, or you could grant rights in a bunch of works. How does that make a difference? Because in 304, Congress said the triggering date is the date of copyright originally being secured. I understand that. I understand that. And in Section 203, Congress decided not to do it that way. It said the date of the grant. But regardless of what the distinction is, there is a distinction between these two situations, and the distinction seems to me, in terms of the language of termination here, they're quite different. Oh, they are quite different. Absolutely they're quite different. And Section 203 is only pegged to grants that were granted in a way that's consistent with the purpose of the statute, which was to benefit the statutory heirs. The court itself seems to concede that the statute could be ambiguous as to this. Could have been clearer. And maybe it could have been. But if there is a statutory ambiguity, it needs to be resolved in the favor of the parties for whom Congress was acting to benefit. Thank you. Thank you. You've reserved rebuttal. Thank you. Good morning. May it please the Court. My name is Peter Anderson, and I represent the defendants in this case. May I take off the mask? Yes. I thought I read that. Yes. Your option. It's totally up to you. Thank you. As it is up to each of us. It's not up to them. I appreciate that. It's a pleasure to be back in an in-person court proceeding, and it's a pleasure not to have a mask on. The key here is the definition or the meaning of executed by the author. And there's no ambiguity. It's absolutely clear. The appellants cite Webster's, I believe. It has to be signed by the grantor and grant rights owned by the grantor. We referred to Black's Law Dictionary, which says the same thing. And as Your Honor pointed out, Section 204A says the same thing. Signing a grant is not the same thing as executing it. And it is absolutely clear that Hugo Peretti, his wife and his daughters had different rights. Now, counsel has said that the intent of the parties was that they would join all their rights. But the intent of the parties is governed, it's best shown by the 1983 agreement. And if Your Honors look at pages, sections or paragraphs four, six and seven, they specifically parse out the rights. They specifically say Luigi, excuse me, I'm sorry, Hugo has the right to claim the renewal copyright if he lives to renew. And if he doesn't live to renew, he gets no payments. He gets no royalties. It also goes on to say that the wife, she has a contingent right that is subject to Mr. Peretti passing before renewing, subject to her being the wife at the time of his death, so she qualifies as the widow, and subject to her being alive in 1989. That's a quite different right than Mr. Peretti had. If Mr. Peretti had lived and renewed, the wife would have no claim to the renewal copyright because her rights are different. So we clearly have an instance where you have four different people signing a contract that has grant language in it that conveys different rights. The Mr. Peretti executed his grant of his rights. The widow, the wife at that point, executed her grant of her rights, and the daughters did the same. These are four different rights, and... That can occur on the same document. And it can occur on the same document. The fact that there's one document versus four should be absolutely irrelevant because joining them, again, Hugo could not convey his wife's rights. He could only convey his rights, and his rights were different. Mr. Anderson, I asked Mr. Clarida, I think Judge Livingston did too, with respect to the distinction between one document and four documents. In effect, why would Congress do that? But I'm going to ask you the same question about the distinction between Section 203 and Section 304. Specifically, why would Congress do this? Why would, in the Section 304 situation, they expressly provide for termination by the successors, and here, on your interpretation, they don't? Now, maybe that doesn't matter. Maybe my job is just to parse the language, but it is always comforting, at least, to try to understand, like, why that distinction might exist. And we know. We're not, in terms of legislative history, we're not pointing to something that some congressman said in the hearing. There is a House report that was worked on with the Register of Copyrights, worked on with industry representatives, worked on with Congress, both the House and the Senate, and it specifically tells us. It tells us that 304 allows the author and his statutory successors to terminate their respective grants. And it specifically tells us, and we quote the language in our brief, specifically tells us that Congress decided to limit 203 to only the right to terminate grants by the author. Now, there is a benefit to the statutory successors in that they succeed to that. If the author has a grant that's terminable, the author can terminate it, or if he's not alive, he or she's not alive, the statutory successors can terminate. So they do get a benefit under 203, but Congress intended a different benefit. Didn't Nimmer, hasn't he said that this was a drafting error, that Congress appears to have drafted these provisions on the erroneous assumption that any grant executed after January 1, 1978 would relate to a work that was also created after that date? Nimmer does suggest that there may have been erroneous reasoning by Congress. And we acknowledge that, I believe, in our briefs. But the point is that that was their error to make. If that was an error, that's still the law. And it's now been, you know, what, 40 years, 40-plus years, and they haven't fixed that if that was an error. Well, are we distinguishing here between a scrivener's error and an error of judgment? My understanding is it's an error of judgment, that they misunderstood a very complicated situation. And it's not the only point in Nimmer on copyright where he suggests, as Congress, I think the 1971-72 amendment that provided protection for sound recordings. So Congress didn't know what it was doing, but it did it, is the critique. And it's clear what it did, because the caption of 203 says grants by an author. And 203 refers throughout to grants by an author. 304 refers to grants by an author or by statutory successors. Now, counsel has mentioned this unequal bargaining power issue, which goes back to the 1909 Act and actually testimony by Mark Twain before Congress in 1908 about how if you're an author, you don't know the value of your work at the time you sign a contract. And so you should have a second chance once it turns out to be a success. And that is completely inapplicable here, because plaintiffs allege in their complaint that this was a success in 1961 when Elvis Presley sang it, and it got into Blue Hawaii. So they have known, by 1983, they had known for 22 years exactly how much money this thing generates. And they had the right to not sign the agreement. They had more leverage than almost any author has, because they could have said, you know what, we'll take our chances that one of us survives for another six years, in which case we own a full one-third. And they decided not to do that. They decided to enter into a contract. It's like a lottery. I'm sorry? It's like a lottery. You're trying to make an assessment of whether to take the lump sum now or— Well, and they could have. They could have negotiated with whatever they wanted. But taking a lump sum at that point was difficult, because they did not know who was going to be the actual owner of the renewal copyright. In fact, for example, in De Silva, the Supreme Court's decision, it was an illegitimate child that no one knew about that turned out to be the copyright claimant in the renewal copyright. So, God forbid, it didn't happen, but all four of the family members could have passed before 1989, in which case we're dealing with an executor or next of kin who didn't sign the contract. So, you know, there were risks. They didn't know who to pay, and that's why Section 6 of the 1983 agreement specifically parses it out. We'll pay you if your grant works and it vests in the other box. It says that very, very clearly. And just to help me out a little bit about the economics, I sort of assumed when I was reading the briefs that this was sort of a situation where people were selling all their rights for, in effect, a lump sum now to the family and that they were, you know, cashing out the royalty. But, in fact, as I read the contract, it seemed to me that's not what's happening, right, that there is a continued stream of royalties is what they are bargaining for. Yes, exactly. They bargained for two things, an equal split on certain kinds of revenues and a royalty on others, which makes it completely different because from the normal situation that Congress refers to an unequal bargaining power, for the simple reason that in this situation they knew exactly what it was generating over time. It's like a Delta blues man walking into the recording studio and for 100 bucks signs away his rights forever in exchange for having a record made. Exactly. Without even, you know, knowing what's going on. And just, you know, again, out of curiosity, so what is the benefit of doing this? Is it just a matter of, in effect, selecting your client or their successors or their predecessors to be the perpetual people in charge of marketing this and giving up a right to change forces later on? Is that what's? I have two answers for you. One that's not in the record and you can tell me if I shouldn't say it. The first one is the opera box were music publishers. Music publishers engage in the business of finding uses, licensed uses for musical works. That's not something a composer does. It's not something that other family members do. The music publishers are set up to do things, to collect royalties from performing rights societies, to register with performing rights societies, to try and get songs into movies and try and get, you know, generate what's called synchronization income for a song. That's what they do. They do it 24 hours a day and that's what the opera box, excuse me, that's what the family members bargain for. And the district court's decision doesn't change that. They're still entitled to the same royalties they agreed to receive in 1983. This isn't about taking rights away from them. This is about their attempt 20 years later to, frankly, misconstrue the statute to try and just cut off. Yeah, I suppose if they were to win, they could renegotiate the numbers or they could, if, for example, they were discontented with your client's services, make the same deal with somebody else that they thought was better. Exactly. I would like to, if I could, just mention one thing. The reply brief refers to Patry and two things. They criticize us for not mentioning that he discussed the case. Well, we didn't know about that when we filed our brief. But if you look at it, he actually agrees with us and makes one factual error. And I can jump to that. At the very end, and it's quoted in the last two pages, pages 19 and 20 of the reply brief, he says- Hang on just one second. Okay. While the heirs' termination right under section 2203 was not valid, they had not reassigned rights in 1983, and therefore when the author died in 1986, they were vested free of any, et cetera. He's right on the first point. Section 203 notice was not valid. He's wrong on the second point when he says that they, that Ms. Peretti and her daughters had not assigned rights in 1983. They did, in fact. We've seen that. The plaintiffs concede that. He then concludes, as of 1989, the renewal copyright vested in the wife and daughters. Well, that's just not true. He just is ignoring the fact that, and I don't mean no disrespect to the gentleman, but he's just got, he has that fact wrong. He's right about the 203 notice being invalid, but he's wrong about the family members not signing their contingent renewal rights, which did vest, and automatically the renewal copyright vested in the opera box. Thank you very much. We'll hear rebuttal. I will make it very brief, Your Honor. Thank you. I just want to return to the executed point, and I heard appellee's counsel talk about executed can only extend to the limits of the rights owned by the signatory. However, the Copyright Act says in 203A1, in the case of a grant, singular, executed by two or more authors of a joint work. How is that possible? If they each have different rights, how can they execute a grant? And it is that a grant that they both execute that is terminated under 203. But if they have a joint right, don't they, it's like, I mean, I'm just thinking. No. No, it's not. They each have separate interests that they could each. Yes, and that's why Mr. Luigi Creatore, in this case, executed his own transfer. He was a joint author in this case. But it's essentially the same category of right. Beg pardon? It's the same in the context of joint authors, right, of a work. It's the same category of right. It's not. Well, but the statute doesn't distinguish between different categories of rights. Well, actually it does because you're leaving out some of the language. 203A says the exclusive or non-exclusive grant of a transfer or license of copyright or of any right under a copyright. So it's not just a grant like a document. It's a grant of a right that we're talking about. And, again, here the parties are doing different rights. So is it the court's position? Saying explicitly that in that case of a joint transfer, there's a different rule or a specific rule. Why would they even have to say that if you were right? Well, why would they have to have this statement at all if the district court were right, that each party can only terminate as to the grants that they particularly own? The district court says you can't terminate rights that you didn't have in the first place. The statute says the opposite. The statute says it's the grant that's terminated, not the limits of one of the signatories' ownership in the grant. And I yield the balance of my time. Thank you. Thank you both, and we'll take the matter under advisement. Nicely argued. Thanks.